IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>EDWARD ZIMBARDI | Criminal Action No.<br>2:26-CR-35 |

**Government's Motion for Detention**

The United States of America, by counsel, Theodore S. Hertzberg, United States Attorney, and Bethany L. Rupert, Assistant United States Attorney for the Northern District of Georgia, moves for detention under 18 U.S.C. §§ 3142(e) and (f).

**1. Eligibility of Case**

This case is eligible for a detention order because this case involves:

A serious risk that the defendant will flee.

**2. Reason for Detention**

The Court should detain defendant because there are no conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community.

**3. Factual Background**

Edward Zimbardi was indicted by a federal grand jury on July 8, 2026, on twelve counts of wire fraud, one count of money laundering conspiracy, and twelve counts of transactional money laundering. Zimbardi created and ran a massive Ponzi scheme between June 2022 and August 2023, where thousands of victims sent over $165 million to cryptocurrency wallets they believed were

intended for investments in advertising packages. Zimbardi called this scheme "The Crypto Program" ("TCP"), which he promoted as a legitimate investment opportunity run by an anonymous group that allowed investors to buy advertising packages and receive guaranteed 25% returns every month, regardless of the performance of those advertising packages. Zimbardi held himself out as the "Master Affiliate" of TCP but disclaimed any ownership or control of it.




Zimbardi promoted TCP through its online website, Cryptoprogram.me, as well as through in-person meetings and videos that he posted on social media. Most of the videos Zimbardi posted were from his home in Flowery Branch, GA (Gainesville). Zimbardi described TCP as a media company that sold advertising packages. He claimed TCP had been around for 15 years offline and that he was helping the people who truly owned TCP by taking it online. Zimbardi said it was called TCP because investors could purchase their advertising packages using cryptocurrency and would be paid their returns in cryptocurrency. He also

claimed that investors could select their media campaigns, whether it was with Google, Fox, CNN, MSN, Yahoo, Facebook, other news outlets, or companies selling products on social media. Each advertisement's performance would depend upon the number of clicks it received online, but regardless of the performance of the purchased advertising packages, Zimbardi guaranteed that investors would receive a 25% return on their investments every 30 days.

Shortly after starting to promote TCP, Zimbardi worked directly with a web developer based out of Colombia to create TCP's website, Cryptoprogram.me.[1] This website ran from October 2022 until July 2023, and it directed victims to register with TCP and purchase packages online via deposits to specified cryptocurrency wallets. The website also listed the different advertising packages available. (*See* Exhibit A).

In his promotion of TCP and its website, Zimbardi described the advertising packages as safer than crypto-investment opportunities involving trading, as he claimed the cryptocurrency used to purchase the packages would not be used for trading. According to Zimbardi, this made the investment in the packages "low risk" and "very sustainable." Moreover, Zimbardi claimed that investors' purchase of advertisement packages was not an investment at all. For example, on the website, Zimbardi posted several disclaimers specifically asserting that

[1] Although Zimbardi repeatedly claimed he did not create the website and did not run it, the FBI's investigation has determined that Zimbardi, did, in fact, create the website using the assistance of a web developer in Colombia. The web developer has interviewed with the FBI and provided recorded communications with Zimbardi regarding the development of the website.

purchase of the packages was not an "investment," as defined under U.S. law, and therefore not subject to SEC regulations. (*See* Exhibit B).

To keep the Ponzi scheme going, Zimbardi used a tool called Bulk Sender to distribute funds received from later victims to earlier victims, such that those who purchased advertising packages earlier in the scheme believed they were receiving the 25% returns promised to them. Zimbardi used the same cryptocurrency wallets that received victim funds to further distribute those funds, and Zimbardi kept track of victim investments through Cryptoprogram.me, which recorded victim information and investments.

By June 2023, however, Zimbardi's distribution system broke down, and victims complained that they were not receiving the returns promised to them. Soon, the Securities and Exchange Commission (SEC), Commodity Futures Trading Commission (CFTC), and California Department Financial Protection & Innovation (CDFP&I) began investigating TCP and Zimbardi. And the CDFP&I issued a cease-and-desist order against TCP and Zimbardi, finding that Zimbardi had lured victims into an investment fraud scheme.

In what appeared to be a direct response to that order, later the same month, Zimbardi changed the name of TCP to Amsys—announcing the change at a summit meeting at Chateau Elan in Braselton, Georgia— and continued to operate it for two more months, until August 2023. Zimbardi claimed the name change was due to investor confusion about the purpose of the program, rather than the ongoing investigations of TCP. At the same time, Zimbardi—frustrated with victims who complained or questioned TCP/Amsys—took to social media to threaten to cancel the advertising packages of anyone else who complained or

otherwise did not follow Zimbardi's instructions regarding TCP/Amsys. (*See* Exhibit C). Although TCP's name changed, the scheme remained the same. Zimbardi directed victims to a new website that he created—Amsys.io—which performed the same function as Cryptoprogram.me and continued using a cryptocurrency wallet for the receipt of victim funds.

FBI's investigation determined that Zimbardi was in control of the cryptocurrency wallets that received victim funds for TCP and Amsys, as he maintained the seed phrases[2] for those wallets. Careful tracing of victim funds has shown that Zimbardi sent over $34 million of victim funds to an entity called IMGFX – a broker for Forex trading. Zimbardi was one of the managers of IMGFX, and he used victim funds sent to IMGFX to make very risky trades on Forex, resulting in a total loss of the funds. Additionally, Zimbardi sent over $10 million in victim funds to himself, whether to other cryptocurrency wallets or his bank accounts, and he used those funds to pay for his expenses, as well as to make alimony payments to his ex-wife, buy expensive vehicles for his children, and even buy a house for his son.

Like with most Ponzi schemes, Zimbardi could not keep up with the demand of returns to the victims, especially after losing the money invested in Forex. So, in August 2023, Zimbardi pulled the rug.[3] Zimbardi told victims that Amsys

---

[2] A seed phrase (sometimes called a recovery phrase or mnemonic phrase) is a sequence of 12–24 words that acts as the master key to a cryptocurrency wallet. Anyone who has the phrase can fully control the wallet.

[3] "Pull the rug" (or rug pull) is slang that comes from the crypto and finance world. It describes a situation where the creators or operators of a project suddenly remove liquidity, funding, or support—leaving everyone else with losses.

was on "pause," but instead, he completely shut down the program, and victims lost their investments. Just one week prior to the rug pull, Zimbardi had received $350,000 in cash from victims he met in person and convinced to invest in Amsys. Around the same time, Zimbardi bought first-class tickets for he and his family to Hawaii, and within two weeks of the rug pull, Zimbardi and his family flew to Hawaii and stayed there for a month.

Since that time, multiple civil and criminal investigations of Zimbardi and TCP/Amsys were opened by federal and state authorities in the United States, as well as those in Canada and in the Netherlands.[4] Not long after Zimbardi and his family returned from Hawaii, Zimbardi traveled to the Netherlands, where he was arrested by Dutch authorities in February 2024. Although Dutch authorities did not pursue prosecution of Zimbardi due to the FBI's investigation at the time, they seized approximately $5 million from Zimbardi's cryptocurrency wallets affiliated with IMGFX and TCP/Amsys. They also seized Zimbardi's devices and provided those to the FBI.

Zimbardi continued to travel outside the United States in 2024 and 2025. In a return visit to the United States from Fiji in July 2025, Zimbardi was stopped by the FBI at the Atlanta airport. Upon seizing his devices, FBI found that Zimbardi was carrying them in faraday bags.[5] Although not arrested at the time of the

---

[4] Zimbardi still is the subject of multiple ongoing civil and criminal investigations with the SEC, CFTC, state of California, Georgia Secretary of State, province of British Columbia, and government of the Netherlands. Each of these entities is aware of the FBI criminal investigation and has provided information on their investigations to the FBI.

[5] A Faraday bag is a specialized container lined with conductive metal layers (like copper or nickel) that blocks incoming and outgoing electromagnetic fields, completely isolating

stop, Zimbardi was made aware of FBI's investigation and impending federal charges. Zimbardi retained U.S. defense counsel after his encounter with FBI and told his counsel he needed to return to Fiji for a short period. Zimbardi purchased a return flight to the United States for September 2025 and assured his counsel and U.S. authorities that he would return to the United States at that time. However, nearly immediately after Zimbardi landed in Fiji, he canceled his return flight to the United States, and he had not returned in over a year. The FBI understands that Zimbardi was able to obtain an investor visa in Fiji and essentially had not traveled outside of that country in over a year.[6]

However, following his indictment in the United States on July 8, 2026, and communication between U.S. authorities and the Fijian government, Fijian immigration authorities reviewed Zimbardi's immigration documents and found them to contain false information about, among other things, his criminal history and place of residence. Thus, on August 13, 2026, Fiji issued an order of deportation against Zimbardi, and he was placed on a flight from Fiji to Los Angeles, California.

**4. Analysis of § 3142(g) Factors**

Zimbardi poses a serious risk of flight, and there are no conditions of release that will reasonably assure the appearance of Zimbardi as required and the safety of any other person and the community. In determining whether any conditions would assure the appearance of Zimbardi and/or the safety of the

---

electronic devices from cellular, Wi-Fi, GPS, and Bluetooth signals. In other words, the bags make it harder to track the devices.

[6] Zimbardi only left Fiji once in November 2025 to travel to Samoa.

community, the Court considers four factors: (1) the nature and circumstances of the offense, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. 3142(g). All four factors weigh in favor of Zimbardi's detention.

Nature and Circumstances of the Offense

The nature and circumstances of the offenses charged against Zimbardi in the indictment are very serious. Zimbardi created and ran a complex Ponzi scheme for over a year, resulting in loss of over $165 million to over 6,000 victims both in the United States and abroad. Zimbardi weaved a web of carefully crafted lies to convince victims to invest in TCP/Amsys and then kept his scheme going by using some of the funds received from later victims to pay earlier victims. Zimbardi also used sophisticated means to both receive the funds and launder them to accounts associated with IMGFX and his own accounts. Zimbardi knew that the cryptocurrency wallets would obscure the location of the funds and prevent victims from learning how they were being used behind the scenes. Zimbardi also knew that attributing ownership to a particular cryptocurrency wallet is difficult as that ownership is associated with a seed phrase that only the owner knows and only the owner knows the location of. Thus, Zimbardi knew that it would be difficult for victims or any investigating authorities to trace the cryptocurrency wallets back to him.[7]

---

[7] Indeed, law enforcement only found the seed phrases to the cryptocurrency wallets by executing search warrants on certain devices used by Zimbardi.

Moreover, Zimbardi regularly attempted to distance himself and TCP/Amsys from any type of U.S. regulatory body by claiming that his program was not subject to securities regulations. And at the same time, Zimbardi claimed his program was safer than other investments in cryptocurrency, giving victims a false sense of security. When Zimbardi was faced with legal challenges to TCP/Amsys, such as the cease-and-desist order from the CDFP&I, he only made it appear as if he complied with the order. And instead of ceasing the operation of TCP, he simply changed the name and website. And then, making matters worse, Zimbardi threatened victims, particularly those in the United States, whose complaints and failure to follow Zimbardi's instructions led to state and federal investigations of TCP.




Zimbardi's offenses are further aggravating because he spent over $10 million of victim funds on himself and his family members, even buying a house for one son and a $250,000 dump truck for another son. And he gambled away over $34 million of victim funds that he traded on Forex.

Then, immediately after pulling the rug on victims, Zimbardi escaped to Hawaii and continued to travel internationally, where victims and investigating authorities could not reach him. After his encounter with the FBI in July 2025,

Zimbardi lied about his travel to Fiji, stating that he would return to the United States after one month when he had no intention of doing so.

Further adding to the aggravating circumstances of Zimbardi's offense, FBI has determined that Zimbardi used aliases to execute his Ponzi scheme. For example, he used the email address jankelley66@icloud com to register the domain name for Cyrptoprogram.me. And when Zimbardi's phones were seized and searched at the Atlanta airport in July 2025, FBI found that one of the phones was associated with that email address and was labeled as "Jan's iPhone." Zimbardi also used the alias Jan Kelley as the contact name for his son, Anthony Zimbardi, in repeated communications. Anthony received substantial victim funds from Zimbardi. The FBI believes Jan Kelley to be a real person, whose personally identifiable information (PII) was used to create the email address used by Zimbardi.

Moreover, in November 2025, FBI executed a federal search warrant on a storage locker containing property from Zimbardi's residence in Flowery Branch, Georgia. In that storage locker, agents found electronic devices, including laptops, USB drives, and crypto wallets. In those devices, FBI located spreadsheets containing the PII of other individuals, believed to be used by Zimbardi to set up cryptocurrency wallets for Zimbardi in the names of these individuals. FBI has not been able to completely trace the source of Zimbardi's current funds and believes that Zimbardi concealed the source of those funds by using the PII of other individuals to set up cryptocurrency wallets using aliases. Thus, again, Zimbardi took significant, calculated steps to both hide his scheme and hide the laundered funds.

Weight of the Evidence

The weight of the evidence against Zimbardi is very strong. The FBI has interviewed numerous victims, all of whom invested in TCP/Amsys based on representations made by Zimbardi. The FBI also interviewed and received documentation from Zimbardi's web developer, who created Cryptoprogram.me and Amsys.io at Zimbardi's direction. Zimbardi's ownership of the cryptocurrency wallets receiving victim funds was confirmed when FBI found the seed phrases for those wallets on Zimbardi's devices in his storage locker in Georgia. Moreover, FBI carefully traced the disbursement of the funds in those wallets and found that they were spent by (1) sending funds to IMGFX, (2) sending funds to Zimbardi's accounts, and (3) sending funds using Bulk Sender. Again, Zimbardi was a manager of IMGFX, and he discussed his use of Bulk Sender to send "returns" to earlier investors with his web developer.

Beyond this, FBI has obtained communications from online platforms as well as Zimbardi's devices, in which Zimbardi admitted to his control of TCP/Amsys and IMGFX.[8] And further investigation of the funds in the cryptocurrency wallets, as well as information from numerous advertising companies in the United States and abroad, has confirmed that none of the funds victims sent to the cryptocurrency wallets were used to purchase advertising packages.[9]

---

[8] For example, Zimbardi admitted to sending "returns" to investors, as well as having the ability to "cancel" packages. He also said in private communications that he was an "executive" for IMGFX.

[9] The FBI has contacted all advertising outlets purportedly involved in TCP/Amsys, and none were aware of it. And, as explained, the funds sent to the cryptocurrency wallets were used only to make trades on Forex, send money to Zimbardi, and send money to earlier investors using Bulk Sender.

History and Characteristics of Zimbardi

Zimbardi is a serial Ponzi-schemer and has a history of fraudulent conduct. Zimbardi was arrested in Georgia in 1996 for theft by deception after he stole inventory from the company he worked for at the time—Menlo Logistics. He was convicted of multiple counts and sentenced to two years in prison. After prison, Zimbardi became involved in multi-level marketing (MLM) and started a company called Fulfillment Central (which eventually became Ownerwiz), registered in Georgia. Through that company, Zimbardi generated income from buying and selling client leads.[10] Through a reverse merger, OwnerWiz took over 95% of the shares of company EZJR in 2012. Zimbardi became the CEO of EZJR. But just a few years later, in 2015, Zimbardi was pushed out of his role as CEO through a settlement with the SEC because the Board of EZJR believed OwnerWiz's business model conflicted with their pursuit of e-commerce.

Shortly after being pushed out of EZJR, Zimbardi became involved in buying and selling cryptocurrency, as well as Forex trading. He would convince others to give him cryptocurrency to trade for them and then split the profits with them (or simply lose their money, which occurred often). Between 2017 and 2022, he was affiliated with several different groups that were "trading crypto," as he referred to it, including IML, Eaconomy, and Prime Avory. During this time, by Zimbardi's own admission, he promoted several Ponzi schemes, including COTP, Metafi Yielders, AUfin, and Grim Minders.[11]

---

[10] According to the SEC, Zimbardi filed for bankruptcy in 2009.

[11] Zimbardi admitted to this in a recorded video that "Ponzi Patrol" leader Brandon Williams provided to the SEC. In the video, Zimbardi claimed that he did not know the groups were Ponzi schemes at the time.

In October 2020, IMGFX was incorporated in Saint Vincent and the Grenadines.[12] In January 2021 (just three months later), Zimbardi incorporated IMG LLC in Georgia and listed himself as the registered agent. Zimbardi worked with several individuals at IMGFX who knew him from his crypto trading promotional activities in prior years. These individuals spoke with the FBI and explained that Zimbardi was known for taking extremely high risks with investors' money. Both with his prior ventures and with IMG, Zimbardi lost much of the money investors gave him to trade, such that he was looking for a new investment venture in 2022. Thus, when Zimbardi started TCP in June 2022, he convinced victims who had lost money with him before to invest in TCP to get their money back. In other words, he preyed on those who were already vulnerable due to losing significant funds in prior ventures and guaranteed them the return of those funds through TCP.

Coupled with his most recent Ponzi scheme through TCP/Amsys, Zimbardi's history and characteristics strongly indicate that he is a continued danger to the community and that he cannot be trusted to provide accurate information to the Court, his probation officer, or even his attorney if he is permitted to be released on bond. Zimbardi's history and characteristics instead suggest that he will lie or cover up conduct in order to achieve the result he desires.

Beyond this, his history and characteristics also show that he is a serious flight risk. Not only did Zimbardi flee to Hawaii when he pulled the rug on TCP/Amsys, but he continued to travel outside the United States to avoid

[12] As explained further below, the government believes that IMG and IMGFX were effectively the same entity.

interaction with the U.S. agencies investigating him at the time. Even when Zimbardi did travel to the United States, like he did in July 2025, he traveled with his devices in faraday bags to make it difficult for law enforcement to track him. And then, after being encountered by FBI in July 2025, Zimbardi obtained defense counsel and then lied to his counsel about taking a trip to Fiji. Zimbardi told defense counsel and U.S. authorities that he would travel to Fiji for approximately one month and then return to the United States in September 2025. But he never returned. Instead, as soon as he landed in Fiji, he canceled his return flight and essentially had not left the island for over a year when he was forcibly deported from Fiji on August 13, 2026.

And Zimbardi was aware that the FBI was pursuing his arrest in 2026. In May 2026, Zimbardi's son was married in Virginia. But Zimbardi did not attend the wedding. In fact, in communications with his ex-wife after the wedding, Zimbardi said that he knew the FBI would be waiting for him, so at the last minute, he canceled his trip. And Zimbardi was correct—based on information the FBI had learned about Zimbardi being on the guest list and renting out an Airbnb for the wedding, agents were waiting in Virginia to arrest Zimbardi after the wedding, but he never showed. Thus, Zimbardi has repeatedly taken steps to evade arrest.

Due to his cunning and manipulative nature and attempts to evade arrest, there is no condition the Court could place on him to guarantee his appearance moving forward.

Nature and Seriousness of the Danger to the Community

Although Zimbardi has little criminal history, the offense conduct and his past history of Ponzi schemes and other fraudulent conduct shows that he is a recidivist. He has repeatedly engaged in schemes to defraud victims both in the United States and abroad. Although the government is not aware of Zimbardi's most recent employment, he has a long history of pursuing "investment programs" and misrepresenting to investors either how their money will be invested or how he will handle those investments.

In speaking with those who worked with Zimbardi most recently in the United States, they believe that Zimbardi is always looking for the next investment scheme, and thus, it is highly likely that he would do so again if permitted to remain on bond in the United States while awaiting trial. There is no set of conditions the Court could place on Zimbardi to keep him from engaging in this type of "employment" if it is what he chose. And the government has no doubt that, even if Zimbardi were prohibited from this type of employment, consistent with his past manipulation, he would attempt to make it appear as if he was compliant with such a condition, when, in fact, he is not.

Thus, the § 3142(g) factors weigh in favor of Zimbardi's detention. There is no set of conditions that would reasonably assure his appearance or the safety of the community.

**5. Time for Detention Hearing**

The United States requests the Court conduct the detention hearing at initial appearance.

The United States requests leave of Court to supplement this motion with additional grounds or presumptions for detention.

Dated: August 17, 2026.

Respectfully submitted,

THEODORE S. HERTZBERG
United States Attorney

*Bethany L. Rupert*
BETHANY L. RUPERT
Assistant U.S. Attorney
Ga. Bar No. 971630

Richard Russell Federal Building
75 Ted Turner Drive S.W., Suite 600
Atlanta, Georgia 30303-3309
Phone: (404) 581-6000
Fax: (404) 581-6181
(470) 585-6368